# EXHIBIT

# C

12-702 SKG

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### AFFIDAVIT

1. I, Jason S. Alznauer, a Special Agent with the Drug Enforcement Administration (DEA), Department of Justice, Eastern District of Virginia, being duly sworn, states as follows:

2. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). I am therefore, an officer of the United States who is empowered to conduct investigation of, and to make arrest for, the offenses enumerated in Title 21. I have been employed with the DEA since June 1999. I have conducted investigations into the unlawful possession, possession with the intent to distribute, distribution of controlled substances, and the associated conspiracies in violation of Title 21, United States Code, Sections 841 (a)(1) and 846 and Title 18, United States Code, Section 1956.

3. This investigation concerns illegal trafficking in cocaine hydrochloride (HCl), a Schedule II controlled substance. This investigation has identified Hiram ALVEREZ, Virginia ALVEREZ and Pedro SANTANA as "brokers", operating in California, in search of multi-kilograms of cocaine HCl to supply unidentified customers in Richmond, Virginia.

4. I present this affidavit in support of a SEARCH WARRANT for: 4658 Riverstone Dr, Apartment 201, Owings Mills, MD 21117.

DESCRIPTION OF RESIDENCE: A multi-unit, white in color apartment building, with the numbers 4658 appears above the rear entryway. Apartment "201" is located on the second floor with a black entry door with the numbers "201" affixed to the door.

1

5. Based upon your affiant's training, expertise, and experience, your affiant knows:

   a. that narcotic traffickers often maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotic business, or as narcotic proceeds;

   b. that narcotic traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code. That narcotic traffickers commonly "front" narcotics (provide controlled substances on consignment) to their clients, and that records are maintained by such narcotic dealers so they can account for their narcotics and the monies owed for these illegal narcotics. That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where narcotic traffickers have ready access to them, including but not limited to residences, offices, vehicles, and storage places;

   c. that it is common for narcotic dealers to secret contraband, proceeds of narcotic sales and/or records of narcotic transactions, narcotic sources, and narcotic customers in secure locations within residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage containers buried underground, in order to conceal such items from law enforcement authorities;

   d. that persons involved in narcotic trafficking conceal caches of narcotics, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of narcotic transactions, and evidence of financial

transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in narcotic trafficking activities in their residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes and/or vehicles;

e. that narcotic traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the narcotic trafficking organization, even if said items may be in code, and that these types of records are sometimes maintained in computers or other electronic data storage devices;

f. that narcotic traffickers frequently take, cause to be taken, photographs and/or videos of themselves, their co-conspirators and associates, their property, and their product, and that these traffickers usually maintain these photographs and/or videos, in their residences, offices, or other places under their control;

g. that narcotic traffickers often keep paraphernalia for packaging, cutting, weighing, manufacturing, and distributing controlled substances, and that such paraphernalia often includes, but is not limited to scales, plastic wrap, plastic bags, vacuum sealers, and aromatic substances such as soap, dryer sheets, wood shavings, heat sealers, and plastic wrapping, etc., which are used to mask the order of illegal narcotics in an attempt to avoid detection by drug detection dogs;

h. that it is common for narcotic dealers to deal/possess weapons, including stolen weapons or other stolen goods and exchange narcotics for such weapons or goods, and these weapons are commonly used by narcotic dealers as an item of investment and for protection from robberies by other narcotic dealers;

i. those narcotic dealers collect proceeds from the sale of illegal narcotics; they often attempt to legitimize these profits. Further, that to accomplish this goal, drug traffickers use sources, including but not limited to, foreign and domestic banks and their attendant services, cashier's checks, money orders, wire transfers, and bank drafts;

j. that narcotic traffickers commonly utilize telephones, both residential and cellular, and pagers as a means of communications to conduct their trafficking "business";

k. that narcotic dealers often purchase expensive vehicles, businesses, and residences with the proceeds from their drug transactions, and that they often keep these items registered in the names of other trusted individuals in order to avoid discovery by law enforcement;

l. that the courts have recognized that unexplained wealth is probative evidence of crime motivated by greed, in particular, trafficking in controlled substances;

m. that individuals and businesses involved in the illegal distribution of controlled substances often use computer equipment to document and track their business affairs, including their illicit sales and disposition of the proceeds of their sales;

n. there are many reasons why criminal offenders maintain evidence for long periods. The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, telephone and pager bills, keys to safe

4

00164

deposit boxes, hardware and software computers), but have significance when considered in light of other evidence. The evidence may be highly valuable to the offender, and at the same time be of usefulness for evidentiary purposes, such as valuable investments (e.g. art, jewelry, precious metals and stones, real estate, securities), large sums of currency drug or money laundering ledgers, safes, customer lists, firearms, communications equipment, vehicles, airplanes, vessels, computers, counter surveillance equipment, scales and packaging equipment;

o. as an experienced narcotic investigator, I have found that illegal narcotic trafficking is a continuing activity over months and even years. Illegal narcotic traffickers will repeatedly obtain or manufacture and then distribute controlled substances on a somewhat regular basis, such as any distributor of a legitimate commodity would purchase stock or sale, and similarly such narcotic traffickers will have an "inventory" which will fluctuate in size depending upon the demand for the product. A trafficker on an essentially continuous basis for use whenever needed often keeps certain types of drug paraphernalia, such as scales for use in weighing amounts of narcotics at the time of purchase, plastic wrap and plastic bags for packaging narcotics for distribution and/or transportation. Further, that traffickers keep records of their illegal activities for months or years beyond the time during which they actually possess illegal narcotics, in order to maintain contact with their criminal co-conspirators and associates for future transactions, and so that they have records of prior transactions for which, for example, they might still be owed money, or might owe someone else money; and

5

    p. drug traffickers often use the narcotics that they traffic and manufacture and/or other narcotics, and it is common to find personal use quantities of narcotics and paraphernalia consistent with the use of these substances on their persons and on their property.

6. All of the above being proceeds, instrumentalities and evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1), that is the conspiracy to distribute and distribution and possession with the intent to distribute controlled substances, including a mixture or substance containing cocaine.

## PROBABLE CAUSE

7. The facts set forth in this Affidavit are based on my personal participation in this investigation and from information provided by Special Agents, Task Force Agents, and Police Officers (collectively referred to as the "Agents") from various federal, state, and local law enforcement agencies, and on my experience, training, and background as a DEA Special Agent. This affidavit is prepared solely for establishing probable cause to search the listed address. I have not included every fact known to me concerning this investigation and have set forth only the facts necessary to support the issuance of search warrants.

8. In January 2012, agents received information at the Riverside, California District Office from a reliable DEA Confidential Source (CS-1) that he/she was approached by Hiram ALVEREZ and his wife Virginia ALVEREZ as buyers of 100 kilograms of cocaine HCl for customers in Richmond, Virginia. Hiram ALVEREZ described the Richmond customers as having in their possession between 1.4 and 2.4 million dollars to purchase the 100 kilograms of cocaine. DEA intelligence has indicated that both Hiram ALVEREZ and

6

Virginia ALVEREZ are known drug traffickers operating as brokers in Arizona, California, Georgia, New Mexico, and Maryland. Based on the contacts between these individuals, investigators believe that Hiram and Virginia ALVEREZ believe that CS-1 is a major drug connection who can produced the 100 kilograms of cocaine in exchange for the referenced cash.

9. According to the CS-1, in furtherance of the proposed purchase of 100 kilograms of cocaine, Hiram ALVEREZ and the CS agreed to fly from California to Richmond, Virginia during the week of January 23, 2012 to meet with the unidentified drug traffickers in Richmond, Virginia. To ensure that the ALVEREZ'S interests are protected, they agreed to send an individual known as [redacted] with the CS-1 to Virginia. Once they arrived in Virginia, they planned to meet the following day with the Virginia customers and travel to a prearranged location to count the money and ensure that the customers are capable of purchasing the requested cocaine prior to arrangements being made to transport the cocaine to Virginia. In addition, according to the CS-1, it had been agreed upon by all parties that the cocaine will be delivered within 36 hours.

10. On January 25, 2012, the CS-1 made flight reservations to travel from California to Virginia. DEA Intelligence indicated that CS-1 flew in on American Airlines Flight 2442 at 11:10 a.m., Pacific Time to Dallas, Texas. [redacted] travelled on American Airlines Flight 2443 at 10:10 a.m., Pacific Time to Dallas, Texas. Once in Dallas, Texas, the CS-1 and [redacted] travelled on American Airlines 1316 at 3:35 p.m., Central Time to Richmond, Virginia, arriving at 10:10 p.m., Eastern Time.

11. On January 26, 2012, at approximately 10:15 p.m., CS-1 and [redacted] arrived at the Richmond International Airport (RIC). After retrieving their luggage and renting a

7

vehicle, CS-1 and ▓▓▓▓ traveled to the Hyatt Hotel located at 4730 Painters Mill Road in Owings Mills, Maryland 21117. On January 27, 2012, surveillance was initiated at the above location. At approximately 9:40 a.m., investigators observed a black male arrive at the Hyatt Hotel driving a black Toyota four door sedan, bearing Maryland registration 3MD9184. Investigators observed the operator of the vehicle make contact with CS-1 in the lobby of the Hyatt Hotel. The unidentified male (later identified as "Scroll" by CS-1 as described in paragraph 12) then directed CS-1 to follow in his vehicle. Investigators maintained surveillance of the two vehicles and observed them enter the River Stone community which is a gated community. Investigators established a perimeter of the area and located the black Toyota parked in front of an apartment building identified as 4658 Riverstone Dr, Owings Mills, Maryland 21117. Investigators were in constant contact with CS-1 during this period, and were advised that he/she had been directed by "Scroll" to pull his/her vehicle into an associated garage. In addition, SANTANA was with CS-1 during all of these events. CS-1 and "Scroll" then entered the apartment associated with the garage. Once inside the apartment, CS-1 was present during a discussion that focused on the purchase of approximately 100 kilograms of cocaine. "Scroll" advised he was attempting to purchase this amount of cocaine and was in possession of a large amount of currency. During the conversation, "Scroll" produced a duffle bag that contained a large amount of U.S. currency. "Scroll" advised the CS that the bag contained approximately $300,000.00. Scroll further advised that he was in the process of collecting profits from a prior cocaine purchase, and would be in possession of approximately $2,400,000.00 to complete the agreed purchase of the 100 kilograms of cocaine.

8

12. The meeting was concluded and investigators observed a garage door open and CS-1 leaving the location in his/her vehicle. Based on the location of this garage door, investigators were able to determine that the particular garage is solely associated with apartment 4658 Riverstone Dr, Apartment 201, Owings Mills, MD 21117.

13. Investigators had the opportunity to speak with the CS following the meeting with the unidentified male. The CS advised investigators that the male identified himself as "Scroll". In addition to attempting to purchase 100 kilograms of cocaine, "Scroll" also admitted to a recent purchase of 50 kilograms of cocaine. The CS advised that "Scroll" is in the process of collecting the funds, and would contact the CS once he has the remaining funds available.

14. Later that same evening, surveillance units observed numerous vehicles arrive at 4658 Riverstone Dr. Apartment 201. Each of these vehicles entered the garage and the door closed behind them. Minutes later, the garage door would open and the vehicles would exit the complex. At approximately 6:30 p.m., "Scroll" told CS-1 that he would have 1.5 million dollars by 7:00 p.m. and an additional $400,000.00 by 9:00 p.m. At approximately 7:00 p.m., CS-1 agreed to meet "Scroll" and begin to count the money. Approximately five minutes later, surveillance unit observed CS-1 leave the Hyatt hotel and drive to 4658 Riverstone Dr. Apartment 201. Surveillance observed the garage door open and CS-1 drive his/her vehicle inside.

## CONCLUSION

15. Based upon the above facts and my experience in the participation of numerous search warrants, I believe there exists probable cause to believe that the unidentified drug traffickers are involved in drug trafficking and have knowingly possessed with intent to

9

00169

distribute, and has distributed cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. It is my belief that evidence of these violations is located in this residence and outbuildings contained on the property known and described as 4658 Riverstone Dr, Apartment 201, Owings Mills, MD 21117.

20. WHEREFORE, I respectfully request that a search warrant for these locations be issued, authorizing any agent of the Drug Enforcement Administration, with proper assistance, to enter and search the premises for the aforementioned items, all of which are evidence of fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846. Due to the timeliness of this request, I request authority to search after 10:00 p.m. if necessary due to the urgency of this investigation and likelihood that the evidence will be compromised if forced to wait to the next morning at 6:00 a.m. I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Jason S. Alznauer, Special Agent
Drug Enforcement Administration

Sworn before me on January 27, 2012
In the City of Baltimore, Maryland

Susan K. Gauvey
United States Magistrate Judge

# ATTACHMENT A

### Premises to Be Searched:

A multi-unit, white in color apartment building located at the above address. The numbers "4658" appear above the rear entryway. Apartment 201 is located on the 2nd floor with a black entryway with the numbers "201" affixed to the door. The garage associated with Apartment 201 is located below the unit to the left and has a standard door that is white in color with brick around the edges.

### Items to Be Seized:

1. Computers that could be used to store information relating to the transportation, ordering, purchasing, and distribution of controlled substances.

2. ~~Drug paraphernalia, including materials for cutting, weighing, and packaging controlled substances.~~

3. Books, records, receipts, notes, ledgers, and other documents relating to the transportation, ordering, purchasing, and distribution of controlled substances.

4. Personal books and papers reflecting names, addresses, telephone numbers and other contact or identification data relating to the distribution of controlled substances.

5. Cash, currency, and records relating to drug trafficking income, and expenditures of money and wealth, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and precious metals and gems.

6. Documents indicating interstate and foreign travel, including itineraries, plane tickets, boarding passes, motel and hotel receipts, passports, visas, credit card receipts, and telephone bills.

7. Photographs of confederates, assets or controlled substances, or the spending of drug proceeds.

8. Indicia of occupancy and of ownership of real and personal property.

9. Cellular telephones, pagers, and electronic storage devices.

10. Firearms and ammunition.